**No. 23-3158**
-----------------
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
-----------------

LAURA LOOMER, as an individual, LAURA LOOMER, in her capacity as a
Candidate for United States Congress, and LAURA LOOMER FOR CONGRESS,
INC.,

*Plaintiffs-Appellants*,

*v.*

META PLATFORMS, INC., MARK ZUCKERBERG, in his capacity as CEO of
Meta Platforms, Inc. and as an individual, X Corp., and JACK DORSEY, in his
capacity as former CEO of Twitter, Inc. and as an individual, THE PROCTOR &
GAMBLE CO., and DOES 1-100, individuals,

*Defendants-Appellees.*

----------------------------------------

On Appeal from the United States District Court
for the Northern District of California, Case No. 3:22-cv-02646-LB
The Honorable Laurel Beeler, United States District Judge
----------------------------------------
**APPELLANTS' OPENING BRIEF**
----------------------------------------

JOHN PIERCE LAW, P.C.
John M. Pierce
jpierce@johnpiercelaw.com
21550 Oxnard St.
3rd Flr., PMB 172
Woodland Hills, CA 91367
Tel: (213) 349-0054

*Attorneys for Plaintiffs-Appellants*

## DISCLOSURE STATEMENT

There is no publicly held corporation that owns 10% or more of stock in any appellant entity.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ……………………………………………....4

INTRODUCTION…………………………………………………………….7

JURISDICTIONAL STATEMENT………………………………………10

STATUTORY AUTHORITIES…………………………………………..11

STATEMENT OF THE CASE……………………………………………...12

    A. Ms. Loomer brings this appeal as an individual and as CEO of Loomer for Congress……………………………………………..12

    B. Twitter and Facebook arrange "preferred" narratives on their Platforms and primarily target conservatives and conservative politicians, including Ms. Loomer and her campaign………………………………………………………….14

    C. In May 2019, P&G provided a list of persons that were to be banned by Facebook, including Ms. Loomer, because they were deemed "Dangerous Individual(s)." ...................................................................15

    D. On November 21st, 2018, Ms. Loomer was permanently banned by Twitter. She sued on December 6th, 2018. On May 2nd, 2019, Ms. Loomer was banned from Facebook. She sued Facebook on August 5th, 2019…………………………………………………………..14

    E. New information revealed that Facebook and Twitter have been suppressing speech content as State Actors in conjunction with the FBI and White House, specifically to undermine the integrity of American elections…………………………………………………..16

    F. The district court dismissed her complaint with prejudice……...…..18

SUMMARY OF THE ARGUMENT………………………………………..18

STANDARD OF REVIEW……………………………………………….20

ARGUMENT…………………………………………………………..21

I.   RES JUDICATA DOES NOT BAR THE CLAIMS AGAINST
     FACEBOOK AND TWITTER…………………………………………21
     A. The Allegations Against Facebook Amount to New Claims for
        Purposes of Res Judicata………………………………………….22
     B. The Allegations Against Twitter Amount to New Claims for Purposes
        of Res Judicata……………………………………………………24

II.  SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES
     NOT BAR THE CLAIMS AGAINST RESPONDENTS…………………26
     A. Respondents Should Be Treated as Information Content Providers and
        Fail the First Prong of This Test……………………………….26
     B. Respondents Should Be Treated as Publishers Or Speakers of the
        Content Provided By Another as Opposing Views are Being Shut
        Down……………………………………………..………………28

III. THE DISTRICT COURT WRONGFULLY DISMISSED THE RICO
     CLAIM AS APPELLANT PLEADED THE CLAIM……………………..30

     A. The RICO Claim Involving P&G Was Adequately Pleaded…….......30

     B. The RICO Claim Involving the FBI and the White House Was
        Adequately Pleaded…………………………………………….....32

CONCLUSION…………………………………………………………...32

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662, 678 (2009)……………………….……………….…….20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 570 (2007)……………………………………….…………….21

*Biden v. Knight First Amendment Institute At Columbia University*,
  141 S.Ct. 1220 (2021)…………………………………………………...13

*Boyle v. United States*,
  556 U.S. 938, 946 (2009)………………………………………………..30

*Dangaard v. Instagram, LLC*,
  No. C 22-01101 WHA, 2022 WL 17342198, at *2, *4 (N.D. Cal. Nov. 30, 2022)………………………………………………………………..27

*Dyroff v. Ultimate Software Grp., Inc.*,
  934 F.3d 1093, 1097 (9th Cir. 2019)………………………………………26

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014)………………………………………....……..30

*Fed. Agency of News LLC v. Facebook, Inc.*,
  432 F.Supp.3d 1107, 1117-18 (N.D. Cal. 2020)………………….…….27, 28

*Gonzalez v. Google LLC*,
  2 F.4th 871, 891 (9th Cir. 2021)……………………………………....…..28

*Hartmann v. Cal. Dep't of Corr. and Rehab.*,
  707 F.3d 1114, 1122 (9th Cir. 2013)…………………………………...18, 20

*Lawlor v. National Screen Service Corp.*,
    349 U.S. 322 (1955)……………………………………………………21, 22

*Mattel, Inc. v. Realtoy Intern., Ltd.*,
    43 Fed. Appx. 51, 52 (9th Cir. 2002)………………………………………21

*Mecinas v. Hobbs*,
    30 F.4th 890, 895-96 (9th Cir.), cert. denied, 143 S. Ct. 525 (2022)………21

*Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest. Emps. Union, AFL-CIO*,
    215 F.3d 923, 927-28 (9th Cir. 2000)………………………………………...24

*Starr v. Baca*,
    652 F.3d 1202, 1205 (9th Cir. 2011)………………………………………20

*Turtle Island Restoration Network v. U.S. Dep't of State*,
    673 F.3d 914, 918 (9th Cir. 2012)…………………………………………22

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)………………………………………………………...28

*Whole Woman's Health v. Hellerstedt*,
    136 S.Ct. 2292, 2305 (2016)………………………………………………21

**Statutes**

2 U.S.C. § 431(20)(A)(i)-(iii)……………………………………………...……...23

18 U.S.C. § 1962………………………………………………………..…10, 11

28 U.S.C. § 1331…………………………………………………….……....10

28 U.S.C. § 1291……………………………………………………...…...11

5

47 U.S.C. § 230…………………………………………………..… *passim*

**Other Authorities**

Fed. R. App. P. 4(a)(1)(A)…………………………………………………...11

Rebecca Green, *Adversarial Election Administration*, 101 N.C. L. Rᴇᴠ. 1077, 1093 (2023)…………………………………………………………...∙30

## INTRODUCTION

This appeal concerns a district court's decision to dismiss an investigative journalist and political candidate's conspiracy allegations on the basis of res judicata, Section 230 of the Communications Decency Act, and a failure to plausibly plead a claim under the Racketeering Influenced and Corrupt Organizations (RICO) Act. JA 1 3. The appellant offered new allegations substantiating cooperation between X Corp (Twitter) and the federal government as well as allegations concerning interference with commerce by threats or violence, interstate transportation in aid of racketeering, wire fraud, providing material support to terrorists, and advocating the overthrow of government. JA 1 2. The general argument is that respondents constitute an enterprise engaged in a pattern of racketeering by banning conservatives like Ms. Loomer from social media platforms under the pretext of hate speech in order to shape elections according to their political and economic preferences. JA 1 4.

This comes after the district court admitted that the claim-preclusion analysis may present a difficult line-drawing problem in the case of continuing conduct and after the district court articulated that "some of the allegations here postdate her filing the previous cases." JA 1 16; JA 1 18. The district court's dismissal on the aforementioned grounds was incorrect and should be reversed.

Laura Loomer ("Ms. Loomer") is a conservative investigative journalist and activist. Her investigations have uncovered fraud and corruption within the Hillary Clinton campaign, Islamic extremism on college campuses, the Las Vegas Shooting, flaws and loopholes within the federal immigration system, and widespread voter fraud throughout the United States. Ms. Loomer has been targeted by the Left and Big Tech, and is banned on nearly every single social media platform, including Meta Platforms (Facebook) and X (Twitter), two critical platforms for a political candidate and public figure. JA 3 580. Facebook banned her for 30 days in August 2018 and subsequently, Twitter banned her in November 2018. *Id.* Facebook again banned her the following year in May 2019 for her alleged affiliation with the Proud Boys. JA 1 4. Ms. Loomer created a Facebook page in November 2019 as a candidate for Florida's 21st congressional district, but Facebook banned her the following day citing a violation of its hate speech policy. *Id.* The following year in July 2020, Facebook adopted a new policy that for the duration of Ms. Loomer's election campaign, Facebook would not allow any Political Action Committee to promote her campaign on Facebook. JA 1 5. Twitter also did not allow Ms. Loomer to use its platform during the election. *Id.* The previous month, in June 2020, Procter & Gamble (P&G) communicated with Facebook of its new policy to not advertise on or near any content deemed hateful. JA 1 6. Finally, the Federal Bureau of Investigation (FBI) has participated in the

8

aforementioned monitoring of Ms. Loomer's social media presence by restricting her liberties personally and politically: it prohibited her from possessing a firearm in 2019 and, leading up to the 2020 presidential election, removed stories about Hunter Biden's laptop scandal, directly affecting her campaigns. *Id.* The White House also banned information about the efficacy of the COVID-19 vaccine at a time when it was a decisive campaign issue. *Id.*

Ms. Loomer has previously filed lawsuits against Facebook and Twitter for effectively deplatforming her. JA 1 2; JA 2 270. In 2020, Ms. Loomer was the Republican nominee for Congress in Florida's 21st District and in 2022 ran for Congress in Florida's 11th Congressional District. JA 1 3. Ms. Loomer narrowly lost the 2022 race, campaigning as "the only de-platformed campaign in the nation," and is bringing this suit against respondents not only because of their policy of banning Ms. Loomer but also because of new revelations exposing the relationship between the platform companies, particularly Twitter, and the federal government, particularly the FBI. JA 2 274. This relationship, or conspiracy, amounts to a RICO violation and Ms. Loomer has provided detailed allegations sufficient to meet her pleading requirements: she details how the respondents engaged in interference with commerce by threats or violence, interstate transportation in aid of racketeering, wire fraud, provided material support to terrorists, and advocated for the overthrow of the government. JA 1 6.

Respondents targeted Ms. Loomer directly and intentionally: no other federal candidate in the country was banned from advertising on Facebook in the 2020 primary election cycle. JA 1 5. The district court granted respondents' motion to dismiss with prejudice on res judicata, Section 230, and insufficiently-plead RICO grounds. JA 1 15.

However, this Court should reverse and remand for respondents to answer. Alternatively, it should reverse and remand to allow Ms. Loomer to cure any supposed pleading defect with another amendment.

## JURISDICTIONAL STATEMENT

Plaintiffs Laura Loomer and Laura Loomer for Congress ("LLC") sued Defendants Mark Zuckerberg ("Zuckerberg"), Twitter, Inc. ("Twitter"), Jack Dorsey ("Dorsey"), Meta Platforms, Inc. ("Facebook"), The Proctor & Gamble Co. ("P&G"), and Does 1-100 (persons within the Executive Branch, particularly the FBI, and others involved in the conspiracy) in the U.S. District Court for the Northern District of California, alleging claims under 18 U.S.C. § 1964(c), which provides for civil remedies for violations of 18 U.S.C. § 1962, which contains the criminal provisions of the RICO Act. The district court had subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331. The district court granted respondent's motion to dismiss and entered a final judgment on September

30, 2023. This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final order of dismissal. Ms. Loomer filed a timely notice of appeal on October 24, 2023. *See* Fed. R. App. P. 4(a)(1)(A).

## STATUTORY AUTHORITIES

1. 18 U.S.C. § 1962 Prohibited activities. (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

2. 18 U.S.C. § 1962 Prohibited activities. (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

3. 47 U.S.C. § 230 - Protection for private blocking and screening of offensive material (The Communications Decency Act).

## ISSUES PRESENTED

The issues presented are whether (1) res judicata bars the claims against Twitter and Facebook, whether (2) Section 230 bars those claims, and (3) whether the RICO claims are plausible and substantiated.

## STATEMENT OF THE CASE

11

### A. Ms. Loomer brings this appeal as an individual and as CEO of Loomer for Congress.

Appellant, Laura Loomer ("Ms. Loomer") is an individual, resident of Florida, and CEO of LLC, her campaign platform. JA 2 121. Appellant, Laura Loomer ("Candidate Loomer") was the Republican Party nominee for U.S. House Florida District 21 for the 2020 General Election and a candidate for the Republican Party nomination for U.S. House Florida District 11 in the 2022 Primary Election. *Id.* Appellant, Laura Loomer for Congress, Inc. ("LLC"), is a Florida corporation that engages in activities that affect interstate and foreign commerce. *Id.*

### B. Twitter and Facebook arrange "preferred" narratives on their platforms and primarily target conservatives and conservative politicians, including Ms. Loomer and her campaign.

Respondents Twitter and Facebook are social media platforms ("Platforms") that distribute information already spoken or published. JA 2 122. These Platforms have transformed across time into public forums that are as integral to a modern society for conveying public opinion as are other common carriers in the performance and distribution of other common goods and services. JA 2 271. Historically, once these Platforms—like the common carriers that preceded them— have secured a dominant market share, they primarily increase revenue by engaging in conduct that is disadvantageous to competitors and manipulative of the

market. JA 2 271-72. Consequently, states are beginning to codify the substantial interest those states have in regulating these Platforms as common carriers and protecting their constituents from the harmful effects of their market manipulations and the Supreme Court of the United States has published an opinion that conveys an interest in doing the same. *See Biden v. Knight First Amendment Institute At Columbia University*, 141 S.Ct. 1220 (2021) (Thomas, J., concurring).

Twitter and Facebook utilize several mechanisms for furthering their market manipulations. First, they establish community guidelines that—on their face— seem innocuous, with a particular focus on "hate speech" and "dangerous individuals". JA 2 272-73. Second, they deploy so-called 'fact-checkers' who exert activist biases on their Platforms, suppress "clicks", arrange 'preferred' narratives—eerily similar to George Orwell's Ministry of Truth—from "authoritative sources", and otherwise make decisions that cannot be appealed by content creators. JA 2 272. In March of 2020, Facebook 'fact-checkers' applied warning labels on about 40 million posts related to the COVID-19 'pandemic.' *Id.* When posts including these labels appeared on a user's news feed, they did not go on to view the original content in 95% of cases. *Id.* Third, they manufacture and deploy algorithms that are designed to target and censor conservatives before content can even be reported by human users, while stoking divisiveness and polarization. *Id.* Fourth, they deploy 'moderators' who, like "unapologetic liberal

13

torchbearer[s]", exert left-wing bias, ruthlessly censoring conservatives by "shadow banning" while applying different standards and manufacturing exceptions for leftists who violate their community guidelines. *Id.* These Platforms engaged in an astronomical increase in speech suppression after 2018; which predominantly targeted conservatives, conservative politicians, or anyone (including investigative journalists) who might question the motive of a political subdivision's response to COVID-19. JA 2 272-73. While suppressing the voice of conservative politicians, these platforms have allowed terrorist organizations such as ISIS, Al Qaida, Hezbollah and Hamas to maintain a widespread presence on Facebook and Twitter. JA 2 296-97. When these organizations use American social media platforms for their propaganda, it is akin to those platforms' support of the overthrow of our government.

### C. In May 2019, P&G provided a list of persons that were to be banned by Facebook, including Ms. Loomer, because they were deemed "Dangerous Individual(s)."

Respondent, P&G, is an Ohio corporation specializing in consumer goods that engages in activities affecting interstate and foreign commerce. JA 2 129. It is one of Facebook's largest corporate advertisement purchasers, and advertises on Twitter as well. *Id.* On April 11th, 2019, in conjunction with the Association of National Advertisers ("ANA"), P&G formed a "New Media Supply Chain" that requires that advertising platforms "prove" that their content is "under their

14

complete control." JA 2 208. Shortly thereafter, in May 2019, P&G provided a list of persons that were to be banned by Facebook, including Ms. Loomer who was to be labeled a "Dangerous Individual", or they vowed to revoke Facebook's advertising revenue. JA 2 209. In conjunction with the ANA, P&G applied significant pressure on Facebook, recruiting various other civil rights groups to boycott the Platform for its failure to remove political ads that contain—as the Anti-Defamation League said—"blatant lies." JA 2 273.

### D. On November 21st, 2018, Ms. Loomer was permanently banned by Twitter. She sued on December 6th, 2018. On May 2nd, 2019, Ms. Loomer was banned from Facebook. She sued Facebook on August 5th, 2019.

On November 21st, 2018, Ms. Loomer was permanently banned by Twitter for "hateful" conduct and on May 2nd, 2019, she was banned from Facebook, who claimed that she was a "dangerous" person, "an opinion that is not capable of being proven true or false." *Id.* On this date (around August 2nd, 2019)—in reliance on Twitter and Facebook's public promises to give candidates access to their Platforms—Ms. Loomer formed LLC and then announced her candidacy for the Republican nomination for the 21st Congressional District of Florida. JA 2 273. On November 11th, 2019, LLC attempted to set up its official campaign page on Facebook for Candidate Loomer, which was promptly banned under an ad hominem veil of "hate speech." JA 2 273-74. After inquiring into Candidate

15

Loomer's ban, Facebook changed its policy on political candidates to exclude candidates who had been previously banned from the Platform, ex post facto.  JA 2 274.  To add injury to injury, Political Action Committees that attempted to advertise or promote her campaign had their advertisements removed while Facebook simultaneously amplified the narratives and advertisements of her Democratic political opponent.  JA 1 5.

On August 18, 2020, Candidate Loomer won the Republican Primary for U.S. House Florida District 21, and the following day Twitter announced that Plaintiffs would still not be allowed to use its Platform.  JA 2 274.  On February 24th, 2021, Candidate Loomer filed and announced her candidacy for Florida's 21st House District and then switched to Florida's 11th House District amid the redistricting process in Florida.  *Id.*  Ms. Loomer remained the only de-platformed candidate in the nation and lost the 2020 General Election and the 2021 Primary Election—despite significantly out-fundraising her opponent—as a direct result of Twitter and Facebook's election gamesmanship.  *Id.*

### E. New information revealed that Facebook and Twitter have been suppressing speech content as State Actors in conjunction with the FBI and White House, specifically to undermine the integrity of American elections.

Ms. Loomer has previously sued Respondents Facebook and Twitter for her removal from these Platforms.  JA 1 2; JA 2 274.  However, new information,

16

including admissions, have revealed that these Platforms have been suppressing speech content as State Actors in conjunction with the FBI and the White House, through a software called Jira, specifically to undermine the integrity of American elections. *Id.* Three examples were mentioned in the district court's motion to dismiss the first amended complaint ("FAC"): (1) in 2019, the FBI red-flagged the plaintiff in its "[NICS] database," causing her to be prohibited from possessing a firearm; (2) in the weeks leading up to the 2020 presidential election, Facebook allegedly "algorithmically suppressed stories about the Hunter Biden laptop scandal" at the FBI's request or warning; and (3) COVID-19 vaccine skeptic Alex Berenson was allegedly banned from Twitter at the White House's request. JA 1 6.

These allegations were further substantiated when independent journalists released internal Twitter documents in October 2022. JA 2 188. These documents revealed how Twitter coordinated with the FBI to censor core political speech protected by the First Amendment. JA 2 115. In December 2022, new Twitter owner Elon Musk himself tweeted that Twitter was "both a social media company and a crime scene." *Id.*

Collectively, these Respondents compose the Community Media Enterprise ("CME"); a criminal enterprise, in conjunction with the FBI and other executive branch agencies, that has engaged in a multiplicity of predicate acts through

17

extortion, transportation, transmission, providing material support and advocating for the overthrow of government; creating an artifice of community policies and schemes to exploit and defraud the Appellants, millions of consumers, and—specifically—to cause interference in American politics and its elections.

### F. The district court dismissed her complaint with prejudice.

In closing, despite acknowledging that the claim-preclusion analysis may present a difficult line-drawing problem in the case of continuing conduct, and after articulating that "some of the allegations here postdate her filing the previous cases," the U.S. District Court for the Northern District of California found res judicata barred the claims against Twitter and Facebook, § 230 also barred those claims, and the RICO claims were futile. JA 1 15. The district court entered a motion to dismiss with prejudice. *Id.* This appeal follows.

### SUMMARY OF THE ARGUMENT

This Court reviews the dismissal of a complaint under Rule 12(b)(6) de novo and affirms such dismissal only when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable theory." *Hartmann v. Cal. Dep't of Corr. and Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013). Ms. Loomer alleged providers of social-media platforms such as Facebook and Twitter, multinationals like P&G (which advertises on those platforms), and unnamed government

officials together unlawfully conspired to censor conservative voices and interfered with American elections, including her 2020 and 2022 congressional elections. JA 1 2. She has pleaded more than enough facts to support her claims under the First Amendment and the Racketeer Influenced and Corrupt Organizations (RICO) Act. Moreover, importantly, these new facts postdate her filing the previous cases and do not simply center on the fact that she was banned from Facebook and Twitter. Ms. Loomer presents three arguments: (1) res judicata does not bar the claims against Twitter and Facebook, (2) § 230 does not bar those claims, and (3) the RICO claims are plausible and substantiated.

First, this Court should revive the dismissed claims against Twitter and Facebook because the complaint stated viable legal claims and is not barred by res judicata or "claim preclusion." The Twitter and Facebook respondents contend that the appellants' claims are barred by the doctrine of res judicata, because like her prior lawsuits against Twitter and Facebook, this case is an attack on their banning her. JA 1 15. The district court analyzed the three elements of claim preclusion and found the only one at issue to be whether there is an identity of claims between this case and the previous cases. JA 1 16. There is not.

Second, this Court should find § 230 does not bar those claims against Twitter and Facebook because these platform companies are not merely passively

displaying third party content but are tipping the scales in favor of one political candidate over another.

Finally, this Court should find the RICO claims are plausible and substantiated because all elements of the RICO claim are met not only among the platform companies and P&G but also among the platform companies and the federal government. Ms. Loomer clearly describes the "common purpose," (2) "structure or organization," and (3) "longevity necessary to accomplish the purpose" as she describes the relationship between P&G and Facebook and between Twitter and the FBI. JA 1 26-27.

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011). In conducting such review, a dismissal is affirmed "only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Hartmann*, 707 F.3d at 1122. This Court ascertains whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "must accept as true all material allegations of the complaint

and must construe the complaint in favor of the complaining party." *Mecinas v. Hobbs*, 30 F.4th 890, 895-96 (9th Cir.), cert. denied, 143 S. Ct. 525 (2022).

## ARGUMENT

### I. RES JUDICATA DOES NOT BAR THE CLAIMS AGAINST FACEBOOK AND TWITTER.

The exact issue is whether the new allegations against Facebook and Twitter between this lawsuit and the previous lawsuit amount to new "claims" for purposes of res judicata. The doctrine of res judicata, or "claim preclusion," bars parties from relitigating claims that they raised or could have raised in a prior lawsuit between the same parties. *Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2305 (2016). The Supreme Court explained that res judicata does not bar a suit when the latter suit alleges new facts or a worsening of the earlier conditions. *See Lawlor v. National Screen Service Corp.,* 349 U.S. 322 (1955). In *Lawlor*, new antitrust violations were committed after the prior judgment and therefore, res judicata was not applicable. *Id.* Furthermore, in a Ninth Circuit case, this Court held that the plaintiff was not precluded from filing a new suit as the "violations arose after the initial suit was resolved." *Mattel, Inc. v. Realtoy Intern., Ltd*., 43 Fed. Appx. 51, 52 (9th Cir. 2002). The Court explained that "this is not a case of res judicata . . . because the present lawsuit is based on conduct which occurred after the entry of the prior judgment." Finally, the Ninth Circuit asks whether the

claims in the present case could have been brought in the previous case. *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012).

### A. The Allegations Against Facebook Amount to New Claims for Purposes of Res Judicata.

New facts, and thus new claims, have developed since the previous cases, including new conspiratorial acts constituting First Amendment violations. The previous lawsuit was an attack on Facebook and Twitter's banning of Ms. Loomer for alleged hateful conduct and for appearing with others banned for hateful conduct. As in *Lawlor*, new facts (and thus new claims), or a worsening of earlier conditions, have developed since the previous lawsuit, including new "conspiratorial acts" constituting "First Amendment violations." Most relevant is Ms. Loomer's promotion of her election campaign on Facebook. Becoming a political candidate and engaging in federal election activity are two distinct facts. The former occurred prior to Ms. Loomer's defamation suit against Facebook on August 5, 2019. However, the latter occurred after the suit. Given this timing, Ms. Loomer could not have raised her RICO claim in the defamation case because the RICO claim was based on her campaign activity, which only occurred after Ms. Loomer's defamation suit. Also, the RICO claim was based on respondents'

actions, whereas the previous cases were based on whether Ms. Loomer's actions constitute hateful conduct which resulted in the ban.

Federal election activity, in relevant part, is defined as: (i) voter registration activity during the period . . . 120 days before . . . a regularly scheduled Federal election . . . ; (ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot); [or] (iii) a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports . . . or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) . . . . 2 U.S.C. § 431(20)(A)(i)-(iii).  Again, these activities only began after Ms. Loomer filed the defamation suit: in 2020, Ms. Loomer was the Republican nominee in the general election to represent Florida's 21st congressional district in the U.S. House of Representatives.  In 2022, Ms. Loomer ran in the Republican primary election for Florida's 11th congressional district.  Therefore, the district court was in error when it concluded that Ms. Loomer could have raised her RICO claim in the defamation case.

### B.  The Allegations Against Twitter Amount to New Claims for Purposes of Res Judicata.

23

New facts, and thus new claims, have developed since the previous cases, including new conspiratorial acts constituting First Amendment violations. The previous case in *Freedom Watch* was filed on December 6, 2018. Am. Compl., *Freedom Watch, Inc. v. Google, Inc.*, No. 1:18-cv-02030-TNM (D.D.C. Dec. 6, 2018). Since that case, the government wants to argue that Twitter has engaged only in "a single course of conduct" that Ms. Loomer cannot split into two cases. *See Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest. Emps. Union, AFL-CIO*, 215 F.3d 923, 927-28 (9th Cir. 2000). Three new material facts occurred after the December 6 filing. First, the federal government worked with Twitter and Facebook to suppress the Hunter Biden laptop scandal. At first glance, it may appear that this action had nothing to do with Ms. Loomer's campaign because the act does not appear to be a direct action by Twitter against Ms. Loomer personally. However, actions like these arguably affected Ms. Loomer's political campaigns. More widespread exposure on Twitter of Hunter Biden's laptop scandal would have likely led to more on-the-fence voters deciding to support conservative candidates like Ms. Loomer. Just because it is difficult to measure the direct effect of Twitter's action to suppress the Hunter Biden scandal on a particular political candidate's campaign does not mean Twitter's conduct is "unrelated" to Ms. Loomer.

Second, banning Alex Berenson from Twitter also arguably had a negative effect on Ms. Loomer's campaign. Alex Berenson is known for suing Twitter on grounds that it suppressed his free speech as a critic of the coronavirus vaccines. He was banned from Twitter in August 2021. In August 2022, the Wall Street Journal reported on new evidence that Biden officials wanted Twitter to ban Berenson. Later that same month, Ms. Loomer narrowly lost her congressional bid in Florida. Twitter's cooperation with the Biden administration to ban Berenson likely caused a chilling effect on free speech to any candidate seeking to question the efficacy or rollout of the coronavirus vaccine. The ban set the parameters around Ms. Loomer's campaign strategy on public health issues and could have been a contributing factor to her losing a close race to the incumbent. Therefore, again, the district court was in error to conclude that Twitter's conduct was "unrelated" to Ms. Loomer and her campaign.

Finally, Ms. Loomer's RICO allegations were further substantiated when independent journalists released internal Twitter documents in October 2022. These documents revealed how Twitter coordinated with the FBI to censor core political speech protected by the First Amendment. In December 2022, Elon Musk himself tweeted that Twitter was "both a social media company and a crime scene." Twitter has therefore not engaged in a "single course of conduct" that "the plaintiff cannot split into two cases" as the district court suggests. Instead, Twitter

25

has engaged in targeted conduct against Ms. Loomer (the ban), as well as generalized suppression of conservative voices, which incidentally affects Ms. Loomer, but works to suppress conservative voices nationwide. These material and very recent facts constitute the basis of a RICO claim, as will be explained below, and should not be dismissed under res judicata.

## II. SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES NOT BAR THE CLAIMS AGAINST RESPONDENTS.

Under the Communication Decency Act, website operators are generally given immunity from liability for third-party content posted but are not immune when they create or develop the information in whole or in part. 47 U.S.C. § 230(c)(1) & (f)(3). The test applied looks at three factors "[i]mmunity from liability exists for (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (cleaned up)." Respondents are not providers of an interactive computer service but are instead information content providers. Moreover, the second and third prongs of the *Barnes* test need to be re-evaluated by the court.

### A. Respondents Should Be Treated As Information Content Providers And Fail The First Prong Of This Test.

First, content that "comes entirely from subscribers and is passively displayed by [the website operator]" does not make the website operator an information content provider.  47 U.S.C. § 230(f)(3) at 1173-74.  In the district court's decision, it points to decisions from Facebook and Twitter to exclude third parties' content such as Ms. Loomer's, to conclude that both Facebook and Twitter are immune from liability for those decisions.  *See also Fed. Agency of News LLC v. Facebook, Inc.*, 432 F.Supp.3d 1107, 1117-18 (N.D. Cal. 2020).  The key distinction is that in that case, a news agency was banned from Facebook, but here, it is a campaign profile that is being banned.  If a news agency is not free to post, that is the immunity that Facebook has authority to adjudicate, but in this case, Facebook and Twitter are acting as direct publishers because they are not "passively displaying" third party content.  Passivity entails a lack of action, but here, the banning of Ms. Loomer's campaign activity gives the opponent a direct upper hand on a major platform.  This can be distinguished from the previous case as a news agency would argue the same, that opposing news agencies would get an upper hand, but in this case, elections are clear adversarial processes.  Therefore, respondents should be viewed as the Meta defendants were in the *Dangaard* case.  *See Dangaard v. Instagram, LLC*, No. C 22-01101 WHA, 2022 WL 17342198, at *2, *4 (N.D. Cal. Nov. 30, 2022) (the "Meta defendants [were] not entitled to [§ 230] immunity for operation of their filtering system," because the filtering system

27

allegedly demoted competitors of the website OnlyFans while favoring OnlyFans, which materially contributed to anticompetitive conduct).  In this dogmatic process between two candidates at the primary or general election stage, the elimination of Ms. Loomer means and calls for the indirect promotion of her direct primary competitor or Democratic party competitor.  This control over the influx of information calls for the courts to reclassify Facebook and Twitter as information content providers rather than as providers of an interactive computer service given immunity under Section 230.

**B. Respondents Should Be Treated As Publishers Or Speakers Of The Content Provided By Another As Opposing Views Are Being Shut Down.**

For the second and third factors, the Ninth Circuit evaluates whether the cause of action inherently requires it to treat the defendant as the publisher or speaker of content provided by another.  *See Gonzalez v. Google LLC*, 2 F.4th 871, 891 (9th Cir. 2021) (cleaned up), *rev'd on other grounds by Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).  In the district court's decision, it points to decisions from Facebook and Twitter to exclude third parties' content, such as Ms. Loomer's, as meaning that both Facebook and Twitter are immune from liability for those decisions.  *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F.Supp.3d 1107, 1117-18 (N.D. Cal. 2020).  The district court cites *Fed. Agency of News LLC*

(where an agency posted about news) which is distinct from the case at hand where Ms. Loomer had her accounts banned during an adversarial process.

The § 230(c)(1) immunities should not be given out without adjacent responsibilities. The immunities protect these social media and other internet platforms from the damage that its users and potential users can face, however when they choose to restrict use, we need to analyze what the results are and how they can potentially backfire. The cases cited in the district court order fail to include cases describing a political adversarial process like the one in Ms. Loomer's campaign platform. With the banning of the campaign platform, they are practically endorsing and promoting Ms. Loomer's campaign opponent. This indirect action means that they are in a way publishing Ms. Loomer's adversaries' campaigns as they are not letting Ms. Loomer post her own campaign. In a dogmatic process such as voting where a voter selects only one person for each seat, a lack of options available on these prominent social media sites should be a responsibility that comes with the granted immunity. What is at issue here is not simply the removal of Ms. Loomer's accounts on Facebook and Twitter, but the presence of unlawful conspiracy to suppress conservative voices like Ms. Loomer's on these platforms. The platform companies should not receive Section 230 immunity for deliberately filtering their platforms in such a way.

Mistrust in the election system is the highest it has been, and this case is clear proof of that. "Still, embedding rival partisans throughout the election process may be the best hope states have to signal to voters across the political spectrum that elections are being scrupulously administered according to the law." Rebecca Green, *Adversarial Election Administration*, 101 N.C. L. REV. 1077, 1093 (2023). Twitter and Facebook should not be allowed to go unpunished for removing a rival partisan from the electoral process. We again urge the court to treat the respondents as publishers as the banning of one candidate is the equivalent of endorsing the others.

## III. THE DISTRICT COURT WRONGFULLY DISMISSED THE RICO CLAIM AS APPELLANT PLEADED THE CLAIM.

### A. The RICO Claim Involving P&G Was Adequately Pleaded.

In order to plausibly plead an associated-in-fact enterprise, a plaintiff must allege that the enterprise has (1) "a common purpose," (2) "a structure or organization," and (3) "longevity necessary to accomplish the purpose." *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)). Appellant has shown that P&G had a common purpose of doing business together with Respondents. Furthermore, the structure and organization can be taken by their actual doing of business together in the form of P&G advertising on Respondent's

30

sites, as conceded by Respondent. Lastly their long-lasting relationship should be enough to show the longevity necessary to accomplish the purpose.

There are new allegations about respondent P&G since Ms. Loomer's defamation suit against Facebook on August 5, 2019, that amount to a plausible RICO claim. In June 2020, P&G's Chief Brand Officer said that P&G would not advertise "on or near content that we determine is hateful, denigrating or discriminatory." "Where we determine our standards are not met, we will take action, up to and including stopping spending, just like we've done before." On the same day, Facebook said that it routinely discusses policy matters with advertisers and would continue doing so. P&G also advertises on Twitter. P&G's coordination with Facebook, a conclusion we can assume given that their policies were announced on the same day, unlawfully censors conservative voices and interferes with American elections. This represents a common purpose to satisfy element one. The fact that the enterprises "routinely" discussed policy signifies an informal structure or organization but it is a structure under the statute nevertheless. Finally, longevity is adequately pleaded because the enterprises have had routine discussions since June 2020: this is more than three years.

The severity of the RICO claim cannot be understated. Because of the respondents' coordination, Democratic opponents, such as Lois Frankel in Ms. Loomer's November 2020 congressional election defeat, were able to advertise

31

more freely on social media platforms throughout their campaigns, giving them an unfair advantage over conservative candidates like Ms. Loomer. Due to Ms. Frankel's ability to advertise on Facebook in the 2020 campaign, she was able to narrowly defeat Ms. Loomer.

## B. The RICO Claim Involving the FBI and the White House Was Adequately Pleaded.

The coordination between the FBI and Facebook and Twitter was detailed in the res judicata section as an example of new facts after the previous defamation suit which should allow for the revival of First Amendment claims against Facebook and Twitter. Such coordination is also an example of RICO violations. By coordinating with social media platform companies, the government officials, particularly the FBI, exhibited a common purpose of monitoring and restricting the success of Ms. Loomer's personal life and campaign activities by restricting her possession of a firearm, suppressing the spread of misdeeds related to the Biden administration such as the Hunter Biden laptop scandal, and banning COVID-19 vaccine sceptic Alex Berenson in the name of public health, at the White House's request, but with intention of silencing conservative voices and issues. Such coordination is an informal but existent structure or organization. Finally, the coordination is long-standing: it began in 2019 and continues to the present.

**CONCLUSION**

32

For the foregoing reasons, this Court should reverse the district court's dismissal of Ms. Loomer's complaint and remand for respondents to answer, because she has adequately alleged that res judicata does not bar the claims against Twitter and Facebook, Section 230 also does not bar those claims, and the RICO claims are plausible and substantiated. In the alternative, and to the extent further allegations are needed to cure any defect, this Court should reverse and remand for the district court to allow Ms. Loomer to file a Third Amended Complaint.

Dated: January 29, 2024                     Respectfully submitted,

JOHN PIERCE LAW, P.C.
John M. Pierce
jpierce@johnpiercelaw.com
21550 Oxnard St.
3rd Flr., PMB 172
Woodland Hills, CA 91367
Tel: (213) 349-0054

*Attorneys for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Plaintiff-Appellant is not aware of any related cases pursuant to Federal Rule of Appellate Procedure 28-2.6.

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Federal Rules of Appellate Procedure 32(a)(4) and Circuit Rule 32-1 that the attached brief is set in Times New Roman font, double-

spaced, has a typeface of 14 points, and, according to the word count feature of the word processing system used to prepare the brief (Microsoft Word 365 for PC), contains 6,920 words.

Dated: January 29, 2024                    By:

                                           s/ *John M. Pierce*
                                           John M. Pierce

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2024, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: January 29, 2024                    By:

                                           s/ *John M. Pierce*
                                           John M. Pierce